**ALBUQUERQUE INDIAN RIGHTS, Appellant,**

v.

**Manuel LUJAN, Jr., in His Trust Capacity as Secretary of the Interior, et al.**

**No. 89–5181.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 15, 1990.

Decided April 12, 1991.

---

Bruce S. Deming, with whom Daniel S. Press, was on the brief, Washington, D.C., for appellant.

Daniel J. Standish, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John Bates, and R. Craig Lawrence, Asst. U.S. Attys., were on the brief, Washington, D.C., for appellees.

Before EDWARDS, D.H. GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Concurring opinion filed by Circuit Judge D.H. GINSBURG.

SENTELLE, Circuit Judge:

This appeal arises from a motion for summary judgment granted by the United States District Court for the District of Columbia upholding the Department of the Interior's ("Interior" or "DOI") refusal to apply the Indian hiring preference afforded by 25 U.S.C. § 472 to positions within the Department's Office of Construction Management ("OCM").

Appellant Albuquerque Indian Rights Association ("AIRA"), an organization of American Indians employed at the Office of Facilities Management ("OFM"), brought suit alleging that appellees violated § 12 of the Indian Reorganization Act ("IRA" or "Act"), 25 U.S.C. § 472 (1988),

by failing to extend the Indian preference to positions within OCM.[1] AIRA argues that because OCM provides services principally to the Indian community, OCM positions should be subject to the Indian preference. Interior contends that AIRA lacks standing to bring this suit and, in the alternative, that its statutory interpretation denying application of the Indian preference outside the Bureau of Indian Affairs ("BIA") merits judicial deference. The district court held that DOI's interpretation of the statute was a permissible construction and, therefore, entitled to deference. We conclude, however, that AIRA lacks standing to bring this suit because its members have suffered no presently demonstrable injury. Consequently, we affirm the district court's dismissal of this claim.[2]

## I. BACKGROUND

### A. *The Statutory Language*

In an effort to give Indian people control over their own affairs, Congress adopted the Indian Reorganization Act. *See Morton v. Mancari*, 417 U.S. 535, 541–42, 94 S.Ct. 2474, 2478, 41 L.Ed.2d 290 (1974). Among other things, the Act provides that Indian applicants should be granted a hiring preference when applying for positions having the primary responsibility of providing services to Indians or to Indian tribes. The principal statutory language at issue in this case is set forth as follows:

> The Secretary of the Interior is directed to establish standards of health, age, character, experience, knowledge, and ability for Indians who may be appointed to the various positions maintained, now or hereafter, by the Indian Office, in the administration of functions or services affecting any Indian tribe. Such quali-

fied Indians shall hereafter have the preference to appointment to vacancies in any such positions.

25 U.S.C. § 472 (1988). The term "Indian Office" is nowhere defined in the statute, nor is it the official name of any known agency within or without the Department of the Interior. DOI has traditionally interpreted the term "Indian Office" broadly to include all units within DOI "directly and primarily related to the providing of services to Indians," not limiting application of the preference solely to positions within the BIA. United States Department of the Interior, Office of the Solicitor, Memorandum Opinion dated 13 June 1979 (interpreting Indian preference provision to apply outside of BIA); United States Department of the Interior, Office of the Solicitor, Memorandum Opinion dated 6 May 1986 (same); *see also* Comptroller General Opinion Letter dated 20 September 1977, p. 10.

DOI most recently has reversed its earlier statutory interpretation, however. DOI now chooses to interpret the term "Indian Office" narrowly, construing it to mean only the BIA itself, and all units removed intact from the BIA. *See The Scope of Indian Preference Under the Indian Reorganization Act*, United States Department of the Interior, Office of the Solicitor, Memorandum Opinion dated 10 June 1988 (*"Scope of Indian Preference"*). It is this statutory interpretation appellant challenges.

### B. *Factual Background*

In 1979, Congress established the Office of Construction Management and placed it under the supervision of the Assistant Secretary of the Interior for Policy, Budget,

---

1. Count II of appellant's Amended Complaint asserted that appellees violated the same § 472 Indian preference provision by filling the OCM Director's position without announcing the position and without providing for the Indian hiring preference. Count III of the Amended Complaint alleged that appellees violated the Buy Indian Act, 25 U.S.C. § 450e(b)(2) (1988), when they awarded a "Support Design and Engineering Services" contract for OCM technical support to a non-Indian engineering firm. The district court granted summary judgment in fa-

vor of appellees on all three counts. Appellant seeks review only with respect to Count I of the Amended Complaint.

2. Although the district court concluded that appellant had standing to pursue this cause, this Court may affirm the district court's dismissal on grounds other than those upon which the district court relied. *See SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *see also Community for Creative Non-Violence v. Lujan*, 908 F.2d 992 (D.C.Cir.1990).

and Administration, who reports directly to the Secretary of the Interior. Act of November 27, 1979, P.L. 96–126, 93 Stat. 954, 966. Congress directed OCM to reorganize completely the BIA's facilities management program, operated under the auspices of BIA's Office of Facilities Management ("OFM"), because of the deterioration of physical facilities on Indian reservations. H.R. Rep. No. 450, 99th Cong., 1st Sess., 59 (1985). Although Congress gave OCM responsibility for all physical facilities maintained by DOI,[3] it specifically instructed OCM to assume full control of BIA's facilities management program. OCM now directly supervises employees formerly supervised by OFM. Employment positions within the BIA (including OFM) are subject to the Indian hiring preference. However, Interior has never applied the Indian hiring preference to OCM positions.

In September, 1987, AIRA, an organization of Indian employees at OFM, submitted a formal protest claiming that DOI was wrongfully failing to apply the Indian preference to OCM positions. AIRA alleged that under § 472, any DOI position that directly and primarily provides services to Indians or to Indian tribes should be subject to the preference. AIRA later claimed to have members who would have applied for jobs with OCM had OCM exercised the Indian preference in filling vacant positions. No AIRA member actually applied for a job with OCM, however. AIRA contends that its members knew the statutory preference did not apply because OCM omitted any reference to the preference in its employment advertisements and believed, therefore, that it was futile for AIRA members to apply in the absence of the preference.

DOI never directly responded to AIRA's formal protest. But on June 10, 1988, the DOI Solicitor issued an opinion which concluded that the Indian preference did not apply to positions within OCM. DOI, in a reversal of its earlier position, now rejects the broad definition of "Indian Office" as meaning any office "directly and primarily" related to serving Indians, and instead construes the term "Indian Office" to mean only those offices within the BIA itself, or those removed intact from the BIA. *See Scope of Indian Preference*, J.A. at 40–53. The DOI Solicitor's memorandum opinion considered the legislative history of the Indian Reorganization Act, its treatment in the courts, and the historical application of the Indian preference at DOI. It also spelled out reasons for differing with earlier opinions issued by the Comptroller General and former Solicitor. Those earlier opinions took the opposite view on a related issue involving the statutory preference. *Compare Scope of Indian Preference* (limiting application of Indian hiring preference to within BIA), *with* Comptroller General Opinion Letter dated 20 September 1977 (interpreting Indian hiring preference to apply outside BIA); United States Department of the Interior, Office of the Solicitor, Memorandum Opinion dated 13 June 1979 (same); United States Department of the Interior, Office of the Solicitor, Memorandum Opinion dated 6 May 1986 (same); The Solicitor's new, narrowed interpretation fueled DOI's refusal to apply the preference to OCM.

AIRA then brought suit in district court asserting that OCM positions should be subject to Indian preference and that DOI's position (as articulated in the Solicitor's memorandum opinion) was an impermissible post hoc rationalization. DOI challenged AIRA's standing claim and rejected AIRA's interpretation of the provision. DOI further argued that its interpretation warranted deference. In a memorandum opinion ("Mem.Op.") issued May 31, 1989, the district court, although determining that AIRA enjoyed standing to bring suit, granted summary judgment in favor of DOI.

The district court determined that AIRA alleged sufficient facts to warrant standing because

> [AIRA's members] applying would have been a futile effort. The gravamen of

---

**3.** Congress described OCM as an operation that "provide[s] department[-]wide services." Act of November 27, 1979, P.L. 96–126, 93 Stat. 954, 966.

plaintiff's complaint is that the defendants are not properly applying Indian preference. Plaintiff has a[t] least two members, if the claim is true, who are harmed by the defendants' action of not applying Indian preference to OCM positions.

Mem.Op. at 5. The district court held that the "injury" suffered by appellant's members was in OCM's refusal to utilize the Indian hiring preference.

In granting the agency's motion for summary judgment, however, the district court determined that DOI's interpretation was a "permissible construction" of the statute. Mem.Op. at 11–12 (relying on *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). The court concluded that, because the statute was not clear, it must defer to the agency's interpretation. The court further rejected AIRA's contention that no deference was due because DOI failed to follow its previous interpretations of the Act. The court decided that "[t]he Solicitor's Opinion explains in detail why he departs from the previous opinions." Mem.Op. at 12 (citation omitted). Finally, the court concluded that Congress intended OCM "to provide an oversight of the BIA"; thus, the implied intent was that no Indian preference should be extended to OCM positions. *Id.*

Appellant appeals the dismissal of its complaint, renewing the claims it put forward below. Appellee DOI seeks affirmance, arguing: (1) that appellant lacks standing and (2) that the language, history, and purpose of the Indian hiring preference provision are consistent with DOI's statutory interpretation, and that this interpretation is entitled to considerable deference by this Court under *Chevron*.

## II. ANALYSIS

### A. *Appellant's Standing*

■ As a threshold matter, we must determine whether appellant AIRA has standing to bring this action. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 616, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973).

"The term 'standing' subsumes a blend of constitutional requirements and prudential considerations." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975)). One of those requirements is found in Article III of the Constitution which "limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.' " *Valley Forge Christian College*, 454 U.S. at 471, 102 S.Ct. at 757. Cases or controversies need not be limited to disputes between individuals, however; an organization is also empowered to bring suit on behalf of its members. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *see also Pennell v. City of San Jose*, 485 U.S. 1, 7, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988); *Automobile Workers v. Brock*, 477 U.S. 274, 282, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (1986); *Humane Soc'y of the United States v. Hodel*, 840 F.2d 45, 52–61 (D.C. Cir.1988); *American Legal Foundation v. FCC*, 808 F.2d 84, 88–92 (D.C.Cir.1987). In *Hunt*, the Supreme Court articulated the criteria necessary for an organization to pursue a claim:

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.*, 432 U.S. at 343, 97 S.Ct. at 2441.

AIRA unquestionably meets the second criterion of this test. "Germaneness" is satisfied by a "mere pertinence" between litigation subject and organizational purpose. *Humane Soc'y v. Hodel*, 840 F.2d at 58; *accord, Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 286 (D.C. Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989). AIRA asserts that it is "an organization of Indian

employees at the Office of Facilities Management," Appellant's Brief at 2, that "was created ... to protect the Indian preference rights of its members and all Indians." Appellant's Amended Complaint ¶ 14. The disputed interest here, *i.e.*, whether the Indian hiring preference should apply to OCM, is clearly germane to AIRA's organizational purpose. In addition, AIRA apparently meets the third criterion because no circumstances exist that would compel individual members to participate in this action.[4] *See Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1329 n. 44 (D.C. Cir.1986).

However, DOI challenges appellant's standing with respect to the first prong of the *Hunt* test. Specifically, DOI contends that the district court erred in finding that any individual AIRA members "would otherwise have standing to sue in their own right." The critical inquiry, therefore, is whether AIRA satisfies the first *Hunt* criterion. Accordingly, we turn to an analysis of AIRA's members' standing under Article III.

### Constitutional Requirements

The requirement of standing "[i]n both [its constitutional and prudential] dimensions ... is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth*, 422 U.S. at 498, 95 S.Ct. at 2205.

This role requires that courts respect coordinate branches of the national government and decide only causes that are *actual*, concrete "cases or controversies." The Supreme Court has articulated the role of judicial power in our tripartite system of government:

> [t]he power to declare the rights of individuals and to measure the authority of governments ... "is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy." Otherwise, the power "is

not judicial ... in the sense in which judicial power is granted by the Constitution to the courts of the United States."

*Valley Forge Christian College*, 454 U.S. at 471, 102 S.Ct. at 758 (citations omitted). Accordingly, standing doctrine, and "the doctrines that cluster about Article III," *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178–79 (D.C.Cir.) (Bork, J., concurring), *cert. denied*, 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983), are designed to confine courts to their "properly limited" function.

No more fundamental component of standing doctrine exists than the requirement of a presently demonstrable injury in fact directly traceable to the defendant's supposedly unlawful actions. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *see also Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d at 1334 ("It is settled law that standing may be grounded on a mere 'trifle,'" so long as injury in fact is present.). The Supreme Court, emphasizing the importance of case-by-case analysis, has stated that "at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury' as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. at 99, 99 S.Ct. at 1607). The injury must be "distinct and palpable," *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206, and not "abstract" or "conjectural" or "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). In addition, there must be a direct causal connection between plaintiff's asserted injury and defendant's challenged action. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)

---

**4.** In the district court, DOI argued that AIRA failed the third criterion of the *Hunt* test solely with respect to appellant's claims for retroactive relief. AIRA elected to abandon all claims for retroactive relief if the district court found it necessary to have individual members partic- ipate in the suit. When the district court found that it was necessary for individual participation in the suit with respect to those positions already filled at OCM, appellant chose to pursue only prospective relief.

("plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief") (citation omitted). The requirement of "actual injury redressable by the court," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 39, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976), enables Article III to limit the federal judicial power "to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968).

■ In short, a member of an organization establishes standing in her own right by demonstrating: (1) an actual or threatened injury that is more than a generalized grievance shared by the population at large; (2) an injury causally related to the actions of the defendant; and (3) an injury which is likely to be redressed by judicial relief against the defendant. *See Diamond v. Charles,* 476 U.S. 54, 62, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986); *Allen v. Wright,* 468 U.S. at 751–52, 104 S.Ct. at 3324–25; *Valley Forge Christian College,* 454 U.S. at 472, 102 S.Ct. at 758. To determine whether AIRA has standing to bring this appeal, then, we must first examine the alleged injury to AIRA's members.

The reviewing court "must police its jurisdiction" carefully by "examin[ing] each of plaintiff's alleged injuries for compliance with the requirement that they be personal and concrete." *Kurtz v. Baker,* 829 F.2d 1133, 1138–39 (D.C.Cir.1987), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988). The "burden is on the plaintiff to allege facts sufficient to support standing," *United Presbyterian Church in the USA v. Reagan,* 738 F.2d 1375, 1383 (D.C. Cir.1984), but we "must construe the complaint in favor of the complaining party." *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206. To maintain a court challenge to DOI's action, then, AIRA must be able to show that its members "ha[ve] been or will in fact be perceptibly harmed by the challenged agency action." *United States v.*

*Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). No mere harm to an ideological interest will suffice. *See Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). The harm must be "personal and concrete." *Kurtz,* 829 F.2d at 1142.

Although there is, admittedly, some ambiguity in defining what constitutes a "distinct and palpable" injury, *Gladstone, Realtors,* 441 U.S. at 100, 99 S.Ct. at 1608, the Supreme Court's

> extensive body of case law ... hardly leaves courts at sea in applying the law of standing. Like most legal notions, the standing concepts have gained considerable definition from developing case law. In many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases.

*Allen v. Wright,* 468 U.S. at 751–52, 104 S.Ct. at 3324–25. Thus, in determining whether an individual member has standing in her own right, we look to the extensive body of case law on standing and to the nature of appellant's alleged injuries.

The injury alleged by appellant is DOI's failure to apply the Indian hiring preference to OCM, a failure supposedly preventing AIRA's members from gaining the benefit of that preference. AIRA, however, has failed to assert that any of its members actually applied for or otherwise sought to fill vacant OCM positions. AIRA merely claims that several of its members were "interested in applying for available OCM positions." Amended Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief ¶ 12. In response to Interior's motion for summary judgment, AIRA proffered short affidavits from six members stating that they "would have applied" for OCM positions had they been advertised with the Indian preference. The district court rightly found that one of the affiants, by stating simply that he was "interested" in an OCM position did "not suggest that he was qualified for the position or he would actually have applied."

Mem.Op. at 4. Two other affiants also stated that they "would have applied" for an OCM position, but never provided any of their own credentials or indicated whether they were otherwise qualified. J.A. at 141, 142. Mere "interest," however, is not sufficient to confer standing. *Cf. Sierra Club v. Morton*, 405 U.S. at 735, 92 S.Ct. at 1366 (if an organization alleges only a "special interest" in adverse agency action and "fail[s] to allege that it or its members would be affected in any of their activities or pastimes," it has no standing). Federal courts have traditionally refused to grant standing to appellants who "would convert the judicial process into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" *Valley Forge Christian College*, 454 U.S. at 473, 102 S.Ct. at 759 (*quoting United States v. SCRAP*, 412 U.S. at 687, 93 S.Ct. at 2415).

Of the three remaining affiants, one stated that she was "a GS–11 Contract Specialist" and "would have been interested in the Contract Specialist position advertised by OCM at a GS–12/13 level," but gave no indication of whether she would have met any qualifications for the higher-level position. Hence, four of the affiants failed to state affirmatively that they would have been qualified under any sort of preference OCM might have applied. *Cf. DKT Memorial Fund, Ltd. v. Agency for Int'l Dev.*, 810 F.2d 1236 (D.C.Cir.1987). Although we do not require those claiming standing to show that but for the alleged illegal conduct of the agency, they would have received the position, *see e.g., Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 260–64, 97 S.Ct. 555, 560–63, 50 L.Ed.2d 450 (1977) (granting standing to plaintiff seeking housing assistance); *Regents of University of California v. Bakke*, 438 U.S. 265, 280–81 n. 14, 98 S.Ct. 2733, 2742–43 n. 14, 57 L.Ed.2d 750 (1978) (granting standing to unsuccessful medical school applicant), we cannot find a basis for standing if there is no realistic possibility of those competing for a position to receive it once the supposed illegality is corrected. *Cf. Doherty v. Rutgers School of Law–Newark*, 651 F.2d 893, 899–900 (3d Cir.1981) (denying standing to challenge affirmative action program where plaintiff was otherwise clearly unqualified for admission).

Furthermore, this is not a case where the mere fact of appeal would allow us to assume that appellant's members were qualified. *See National Maritime Union v. Commander, Military Sealift Command*, 824 F.2d 1228, 1237 n. 12 (D.C.Cir.1987) ("[p]resumably a bidder who believed that it would have no significant likelihood of obtaining the bid on re-solicitation would not bring suit"). Here, affiants are represented by an organization that might choose to bring suit regardless of its members' qualifications. Thus, affiants must state that they were, in fact, qualified for the OCM positions.

Only two of the affiants stated that they were otherwise qualified and would have applied for an OCM position had it been subject to the Indian hiring preference. *See* Affidavit of Frances D. Hayes, Affidavit of Judith A. Bodo. Thus, these are the sole AIRA members who could possibly benefit from judicial intervention. However, at no point in the proceedings below did appellant tender evidence that either of these members (or any others) actually applied for a position at OCM or that to do so would have resulted in a denial of their applications. The present case is distinguished from those in which the courts have framed plaintiff's injury as the loss of an opportunity to compete. *See, e.g., C.C. Distributors, Inc. v. United States*, 883 F.2d 146, 149–50 (D.C.Cir.1989) (granting standing to disappointed bidder). This Court has granted standing where the injury asserted is based on the denial of an opportunity to exercise rights pursuant to a statute. The case at bar, however, involves only OCM job postings for which no AIRA members actually submitted applications. Appellant's members entirely removed themselves from consideration by not applying for OCM positions.

In a situation at least partially analogous to that of the present case, the Supreme

Court has held that a party's failure to apply for membership at a club engaging in allegedly discriminatory membership practices precluded his challenge to its membership policies. *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 166–67, 92 S.Ct. 1965, 1968, 32 L.Ed.2d 627 (1972). *Moose Lodge* involved an African American who was denied service by the Moose Lodge restaurant solely on the basis of his race. The Court concluded that while Irvis had standing to "seek redress for injuries done to him, [he] may not seek redress for injuries done to others." *Moose Lodge,* 407 U.S. at 166, 92 S.Ct. at 1968. Thus, while Irvis could obtain relief for constitutional violations suffered as a result of the Lodge's failure to serve him, he could not sue on the basis of the Lodge's discriminatory membership practices because he had never personally applied for membership. *Id.* at 166–67, 92 S.Ct. at 1968.

The district court, in granting AIRA standing on the basis of the two affidavits alleging that affiants were "otherwise qualified" and "would have applied" absent OCM's failure to apply the Indian preference, determined that applying for a position at OCM by these AIRA members "without Indian preference ... would have been a futile effort." Mem.Op. at 5. Although we note that "otherwise qualified non-applicants may have standing to challenge a *disqualifying statute or regulation,"* DKT Memorial Fund, Ltd. v. Agency for Int'l Dev.,* 810 F.2d at 1238 (citation omitted) (emphasis added), here we have no "disqualifying statute or regulation." The AIRA members were not disqualified from seeking or even obtaining employment with OCM. They disqualified themselves by not actually applying for the vacant positions.

*Cf. Preston v. Heckler,* 734 F.2d 1359, 1366 (9th Cir.1984) (granting appellant standing where she actually applied for employment position). Unadorned statements that AIRA members were "interested" in positions or "would have applied" for positions at OCM had the Indian hiring preference been in place do not satisfy the burden of showing that any of plaintiff's members *"personally* ... suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant[s]." *Valley Forge Christian College,* 454 U.S. at 472, 102 S.Ct. at 758 (emphasis added).[5]

Although the district court "recognize[d]" that applying for a position by two of appellant's members would have been "futile," thereby supposedly providing the injury necessary to establish standing, the record does not support this conclusion. AIRA never offered any evidence relating to the asserted "futility" of applying at OCM. Nor did OCM refuse to consider any of appellant's members for employment because of a failure to apply the Indian hiring preference. The Court in *Moose Lodge* expressly declined to hold that the "chilling effect" of such an alleged discriminatory practice could confer standing on persons who never applied for membership. *Moose Lodge,* 407 U.S. at 168, 92 S.Ct. at 1969. By the same token, appellant's contention in this case that its members were discouraged from applying to OCM because OCM refused to use the Indian hiring preference does not excuse appellant from the basic standing requirement of concrete, personal harm. Accordingly, we conclude that appellant fails to establish the requisite injury in fact, and, therefore, lacks standing to pursue this appeal.[6]

**5.** At least one member of this Court previously concluded that where a party challenging an employment policy fails to "pursue the matter of employment" because he assertedly was deterred from applying by the policy itself, he is left "with none of the elements necessary to standing to complain in court of the actions" of the alleged wrongdoers. *American Jewish Congress v. Vance,* 575 F.2d 939, 947 (D.C.Cir.1978) (McGowan, J., concurring). Judge McGowan observed that a "wholly negative course of action" gives the employment policy "no chance whatever to be operative" and thus fails to focus

the issues before the court in a concrete, personal way. *Id.* at 947. Although Judge Tamm, who wrote for the Court, agreed that the appellant in *American Jewish Congress* lacked standing, he reasoned that the deterrent effect appellant allegedly suffered was not fairly traceable to the action of the federal defendants. *Id.* at 946–47. The third member of the panel dissented. *Id.* at 948 (Robinson, J., dissenting).

**6.** Appellant's failure to establish an injury in fact makes it unnecessary for this court to address causation and redressability concerns or other prudential considerations.

## B. *Merits of Appellant's Claims*

Obviously, as appellant lacks standing to litigate the present claim, we will not determine the case on its merits. Nonetheless, we note that if we were evaluating the merits, it would pose a difficult task because of the scant agency record available in the present case. Should DOI choose to reevaluate its present interpretation of the Indian preference provision, it may wish to conduct a rulemaking process, thereby providing a reviewing court with a more informative record. While we recognize that this is the Department's choice and not ours, we make the suggestion in light of several genuine difficulties appellant raises in the present litigation.

First, when faced with a justiciable lawsuit, Interior would have to justify its departure from past departmental interpretations of the statute. In deciding what deference to afford an agency's statutory interpretation, courts do "consider the consistency with which an agency interpretation has been applied, and whether the interpretation was contemporaneous with the enactment of the statute being construed." *NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 124 n. 20, 108 S.Ct. 413, 421 n. 20, 98 L.Ed.2d 429 (1987). In the present controversy, the Solicitor's opinion represents a dramatic break with past interpretations of the preference provision. The current Solicitor's opinion limits the definition of the term "Indian Office" and, therefore, the application of the Indian preference, to units within the BIA and any unit which had been transferred intact out of the BIA (the Solicitor's memorandum currently recognizes only one such transferred unit). *Scope of Indian Preference.* In contrast, prior opinions within the Department had recognized the term (and therefore the preference) as encompassing positions "within the Department outside the BIA directly and primarily related to providing services to Indians." United States Department of the Interior, Office of the Solicitor, Memorandum Opinion Dated 13 June 1979, J.A. at 26. The 1979 opinion is consistent with earlier administrative interpretations, see Comptroller General Opinion Letter Dated 20 September 1977, and later ones, see United States Department of the Interior, Office of the Solicitor, Memorandum Opinion dated 6 May 1986.

The departure might be especially problematic in the area of regulations applicable to American Indian affairs. Federal law has long recognized that the United States government, in view of "a distinctive obligation of trust incumbent upon [it] in its dealings with [the] dependent and sometimes exploited" Indian nations, "has charged itself with moral obligations of the highest responsibility and trust." *Seminole Nation v. United States*, 316 U.S. 286, 296–97, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480, 1777 (1942). The Supreme Court has recognized that this "overriding duty" requires that where the Department of the Interior (specifically the BIA) has traditionally expressed one position to Congress and the Indian tribes, "it is essential that the legitimate expectation of . . . Indians not be extinguished by what amounts to an unpublished *ad hoc* determination." *Morton v. Ruiz*, 415 U.S. 199, 236, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974) (overturning agency decision to provide certain benefits only to Indians "on reservation" where traditional interpretation had been "on or near reservation").

The same special relationship of trust and enhanced obligation of moral dealing could create a further problem in any future review of the Department's decision to narrow its definition of terms and its application of the hiring preference. Notably, certain canons of construction may apply with greater force in the area of American Indian law than do other canons in other areas of law. More specifically, DOI's interpretation may compel it to confront the longstanding canon that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985) (citations omitted). Obviously, this is not entirely consistent with the strong governing principle of administrative law that where a

"statute is silent or ambiguous with respect to [a] specific issue," the resolution of that ambiguity is presumptively left to the administering agency and "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. Under this familiar *Chevron* rule, the reviewing court's application of the "traditional tools of statutory construction" is limited to an attempt to determine whether or not Congress has unambiguously expressed its intent. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446–48, 107 S.Ct. 1207, 1221–22, 94 L.Ed.2d 434 (1987), *see also NLRB v. United Food & Commercial Workers Union*, 484 U.S. at 123, 108 S.Ct. at 420. Any further resort to the canons of construction in our review of administrative decisions would normally be limited to determining whether or not the agency interpretation is "rational and consistent with the statute." *Id.* at 123, 108 S.Ct. at 421.

However, in the area of American Indian law, the Department may wish to consider that the liberality rule applied in *Blackfeet Indians* and other cases involving native Americans derives from principles of equitable obligations and normative rules of behavior, rather than from ordinary statutory exegesis. It is true that at least one of our sister circuits has treated this rule of liberal construction in favor of Indians as it would treat other canons, deferring to the "agency charged with [the statute's] administration." *Haynes v. United States*, 891 F.2d 235, 238 (9th Cir.1989). However, it is also true that we have not. In *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439 (D.C.Cir.1988), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989), in which we construed an arguably ambiguous statute concerning the power of an Indian tribe to maintain its own tribal courts, we noted that " '[t]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians,' " and ruled that " '[s]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.' " *Id.* at 1444–45 (quoting *Montana v. Blackfeet Tribe*, 471 U.S. at 766, 105 S.Ct. at 2403). Based on the special strength of this canon, we then declined to defer to DOI's interpretation of the governing statute, which had not followed the canon. *Muscogee Creek Nation* at 1445 n. 8.

We certainly do not rule and do not intend to imply that the Department cannot successfully defend its new interpretation. We merely suggest that in order to prepare for doing so, should a justiciable case arise, the Department might give serious consideration to re-examining its interpretation in a forum providing more due process, allowing more opportunity for input from interested parties, and creating a more reviewable record, rather than simply adopting an *ex parte* memorandum followed by the posting of an employment notice.

### III. CONCLUSION

For the foregoing reasons, we conclude that AIRA lacks standing to challenge DOI's interpretation of the Indian preference provision. The district court's judgment is therefore

*Affirmed.*

D.H. GINSBURG, Circuit Judge, concurring in the judgment:

I write separately because my analysis of the standing issue is different from that put forward by the court. I agree, however, that the AIRA was not properly before the district court, and for that reason I decline to join the court's obiter dicta regarding the merits.

### I. STANDING

My analysis of the standing issue differs from the court's in three respects. First, I believe that in the circumstances of this case an AIRA member need not demonstrate that but for the agency's unlawful conduct, she would be qualified for the position she seeks; the DOI has failed to promulgate separate Indian preference criteria, with the result that there are no standards against which a potential applicant can measure her qualifications. Al-

**60**

though a plaintiff whose qualifications are so meager that she could not meet any rational standard for a particular position might not have standing, at least four of the affiants here are not so clearly unqualified.

Second, I believe that, where it would be useless to do so, a potential employee need not submit an application in order to have standing to challenge an agency's employment policy in court. The court does not hold to the contrary, but it does find that the "AIRA never offered any evidence relating to the asserted 'futility' of applying at OCM." Ct.op. at 57. Since at least one affiant appears to assert without contradiction from the DOI that, absent Indian preference, it would have been futile to apply for the position she wanted, the court is mistaken in resolving the standing issue against her on this ground.

Third, I conclude that none of the affiants was eligible to bring suit against the DOI, because none had given the DOI notice (either individually or through the AIRA as her representative) (1) of her desire to apply for a particular position and (2) of her belief that, but for the agency's improper failure to give an Indian preference, she would qualify for that position.

A. *Eligibility under Indian Preference Criteria*

The court concludes that four affiants do not have standing because they do not claim that they would have been eligible for employment even if the DOI had given Indians preference. *See* Ct.op. at 56 (stating that two affiants—Delphi Montoya and Fern B. Reyna—"never provided any of their own credentials or indicated whether they were otherwise qualified"); Ct.op. at 56 (stating that another affiant—Patricia Dyer—"gave no indication of whether she would have met any qualifications" for a particular position); Ct.op. at 55 (approving the district court's finding that Perry Patron did "not suggest that he was qualified"); and Ct.op. at 56 ("affiants must state that they were, in fact, qualified for the OCM positions").

As the Ninth Circuit recognized in a similar action, however, the DOI's failure to promulgate Indian preference criteria for a position makes it impossible to determine whether a putative applicant would have been eligible if the agency had done so. A plaintiff cannot reasonably be required, in order to secure her standing, to demonstrate her eligibility pursuant to non-existent criteria. *Preston v. Heckler*, 734 F.2d 1359, 1365–66 (9th Cir.1984).

The failure to promulgate any criteria at all clearly distinguishes this case from *DKT Memorial Fund, Ltd. v. Agency for International Development*, 810 F.2d 1236 (D.C.Cir.1987). Where, as in that case, a plaintiff challenges the one criterion that it claims disqualifies it from receiving a benefit, it makes sense to ask whether the plaintiff is "otherwise qualified" to receive that benefit. *See* 810 F.2d at 1238–39. Where there are no other criteria against which a plaintiff may be measured, however, that question cannot be answered.

Even without the benefit of any specific criteria, the court might be able to determine that a particular plaintiff is so "wholly unqualified by any rational standards" that it simply cannot view the agency's refusal to give an Indian preference as the cause of her failure to receive a position. *See Preston*, 734 F.2d at 1366. Consider, for example, an Indian who wants a position as a surgeon but lacks any medical training; even if the agency were to give Indians preference, it is obvious that our aspirant would not get the job. The *Preston* court left open the question whether a plaintiff with such meager qualifications would have standing, but cautioned that recognition of even this narrow exception

> would require the court to construct job qualification requirements.... This is a far different task than evaluating job qualification requirements that have been adopted by the Secretary. It is a task that courts are not particularly well suited to, and ordinarily will decline to perform.

*Id.* at 1366 & n. 7.

The court here appears to state a similar, "no realistic possibility" standard in determining the affiants' standing, *see* Ct.op. at 56, but in application the test seems to

be more demanding. For example, according to her affidavit, Delphi Montoya is a "contract specialist" who would have applied for another position as "contract specialist" had Indian preference been in place. Of course, the DOI might promulgate different criteria for different "contract specialist" positions, but it is unclear upon what basis the court concludes that Montoya would have had "no realistic possibility" of obtaining the desired job. The same could be said regarding the court's treatment of Patricia Dyer, a "GS–11 Contract Specialist," who wanted a job "at the GS–12/13 level." *Cf. Preston,* 734 F.2d at 1366 (concluding that plaintiff employed as a GS–04 medical records technician who applied for a GS–11/12 social worker position, *see Preston v. Schweiker,* 555 F.Supp. 886, 888 (D. Alaska 1983), had standing to challenge the DOI's failure to apply Indian preference).

Although it is the plaintiff's burden to allege the facts that support its standing, *United Presbyterian Church in the USA v. Reagan,* 738 F.2d 1375, 1383 (D.C.Cir. 1984), at least these two affiants (in addition to those whose affidavits the court accepts as sufficient) seem to have alleged sufficient facts to establish the mere possibility that they would have received one of the jobs in question had there been an Indian preference in hiring. Indeed, the DOI did not argue in its briefs in this court that any affiant lacks standing for this reason.

B. *Futility of Applying*

The DOI does argue that each affiant lacks standing because she neither (1) applied for a position, nor (2) showed that applying would surely have resulted in her rejection. The relevance of these omissions can be assessed, however, only after clarifying the nature of the injury that the plaintiff asserts.

The AIRA might be asserting either of two "injuries":

(1) the DOI's failure to apply Indian preference to the OCM positions; or

(2) an AIRA member's inability to get a particular job.

There are indications throughout the AIRA's briefs that its claim to standing is based upon an "injury" of the first type. *E.g.,* AIRA Br. at 39–40 (§ 472 "provides a whole package of rights, and the harm caused by their denial begins at the point when the agency establishes the qualifications for the position offered."); R.Br. at 17–18 ("whether or not any members of AIRA could have been hired in a hypothetical sense is irrelevant to the issues in this case, i.e. whether Indian preference should apply, and whether OCM positions should therefore be advertised and processed under [Indian preference]."). While the court's discussion of the necessity of either applying or showing futility suggests that it views the asserted injury as the affiants' inability to get jobs, it too confuses the issue when it describes the injury as the "OCM's refusal to utilize the Indian hiring preference." Ct.op. at 53; *see also* Ct.op. at 55 (injury is the "DOI's failure to apply the Indian hiring preference to OCM").

An "injury" of the first type—manifested, for example, as an Indian's concern that the Executive Branch is refusing to implement congressional policy that Indians should when possible govern Indian affairs—would exist even if the same person would have been selected for a job regardless of whether Indians were accorded a preference. Thus, a plaintiff would not need to show that her application had been rejected, and a non-applicant would not need to show that it would have been futile for her to have applied. For that matter, even a successful applicant could sue! Clearly, however, such an "injury" is too abstract to be cognizable in court. *See Allen v. Wright,* 468 U.S. 737, 754–55, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984).

Failure to receive a job, on the other hand, is a concrete, not an abstract injury and is cognizable in court. A plaintiff could demonstrate that injury by showing that she had applied for a position and been rejected when the agency failed to accord her an Indian preference. A plaintiff normally must apply and be rejected to have standing, but that requirement can be waived where application would clearly be futile. In *DKT Memorial Fund,* this court

recognized that a non-applicant has standing to challenge a "disqualifying statute or regulation." 810 F.2d at 1238. A non-applicant would also have standing, I should think, to challenge as unlawful a policy, such as the DOI's failure to promulgate Indian preference criteria, that has the effect of disqualifying her and rendering her application pointless.

As the court points out, the district court used such a futility theory to find standing despite the affiants' failure to apply. And the affidavit of Frances Hayes appears to allege facts supporting that theory:

> I would have applied for the Education & Facilities Program Coordinator, GM–301–14 (Announcement No. 88–128(b)), opening August 15, 1988 and closing date September 6, 1988 if the position had been advertised as a GM–301–13/14 under Indian preference. I don't have any time-in-grade as a GS–13, so I cannot qualify for a GS–14 position.

Because one member of the AIRA appears to assert that she was not eligible for the position she wanted without the Indian preference, but "would have applied" if the preference had been available, the AIRA's lack of standing cannot be based upon the affiant's failure to apply.

C. *Failure to Notify the DOI of Injury to any Individual*

Although Hayes' standing is not defeated by her failure to fill out an application for employment, she still should not be heard to complain in district court about the DOI's failure to accord an Indian preference; neither she nor the AIRA gave the DOI notice, prior to instituting suit, of her desire to apply for a particular position and of her claim that, in the absence of Indian preference, she would not qualify. The AIRA did, without referring to any potential applicant, register a "formal protest" with the director of the OCM. Its letter of protest set out legal arguments to the effect that the DOI is required to apply Indian preference to the OCM, and threatened that "if any effort is made by OCM to fill any position with a non-Indian until this grievance and protest is resolved, it will be necessary for me to seek a federal court order enjoining OCM from taking such action." It failed to state that any individual member of the AIRA (named or even unnamed) sought or was being foreclosed from a job opportunity by reason of the DOI's failure to apply Indian preference. So far as appears from that letter, therefore, the AIRA was simply taking the opportunity, as an organization dedicated to the advocacy of Indian interests, to assert a position that could benefit one or more Indians.

In sum, I believe that the filing of an application by Hayes was neither necessary nor—assuming that an application would not by itself provide notice of her objection—sufficient to establish her right to sue. Notice that an adversely affected person objects to the agency's policy is the important thing, not the form in which it comes. The policies supporting the congeries of related doctrines that limit judicial power to the resolution of actual disputes requires no less. For example, a plaintiff who fails to give an agency notice that application of a particular employment policy would harm her arguably has no injury, since if she had given such notice, the agency might not have applied the policy to her. Although the court errs in concluding that it would not have been futile for Hayes to apply, it is arguably correct in determining that Hayes has no injury, because requesting that the DOI apply Indian preference criteria to her might not have been futile. That this analysis would tend to fold all exhaustion arguments into standing arguments shows only that these doctrines are based upon a common understanding that litigation is a last resort for parties that have not been able to resolve their differences by means less expensive to society. Litigation tends to polarize the positions of the parties. While that may be advantageous to ideological advocacy groups in some cases, neither the courts nor society at large can count such magnification of disputes as anything but a misfortune.

A dismissal based on the lack of prior notice to the DOI might also be characterized as a dismissal based on want of equity.

**63**

*See American Jewish Congress v. Vance,* 575 F.2d 939, 947–48 (D.C.Cir.1978) (McGowan, concurring separately); *Reuss v. Balles,* 584 F.2d 461, 465 n. 14 (D.C.Cir. 1978) ("[I]f the court believes that the plaintiff has standing ..., it may, nonetheless, because of the unusual circumstances of the case, dismiss for want of equity. *American Jewish Congress v. Vance* (McGowan, J., concurring separately).")

Whether we characterize this case as one in which the plaintiff lacks standing, or one in which it failed to exhaust its administrative remedies, or one in which there is a want of equity, the result and the rationale for it are the same. "The power to declare the rights of individuals and to measure the authority of governments ... 'is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy.' " *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citation omitted). In calling upon the district court to issue an injunction before it had given the DOI notice that any individual was aggrieved by the agency's failure to apply Indian preference, and an opportunity to redress that grievance, the plaintiff here has improperly treated the district court as its first, not its last, resort.

## II. The Merits

As the court points out, standing and other doctrines of justiciability are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). It is more than a little surprising, therefore, that the court, having held that the plaintiff lacks standing, nevertheless goes on to provide an extended discussion of the merits—culminating in advice to the DOI to engage in rulemaking—in a case not before us. For my part, I decline to express any view upon the merits of an issue that the plaintiff has no right to raise

and the court, accordingly, no reason to resolve.